WOOD BALMFORTH LLC
Mary Anne Q. Wood (#3539)
Stephen Q. Wood (#12403)
60 East South Temple Street, Suite 500
Salt Lake City, Utah 84111
Telephone: (801) 366-6060
Facsimile: (801) 366-6061
mawood@woodbalmforth.com
sqwood@woodbalmforth.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BRYAN B. DAVIS, an individual, | ***COMPLAINT*** |
| Plaintiff, | |
| vs. | |
| AARON GARRITY, an individual, GARY HOLLISTER, an individual, GORDON MORTON, an individual, JOSEPH MORTON, an individual, and KENT WOOD, an individual, NATE BROWN, XIC LLC, a Utah limited liability company; XIC II LLC, a Utah limited liability company, JOHN DOES 1-25. | Case No. 2:13-cv-00349-BCW<br><br>Magistrate Judge Brooke C. Wells |
| Defendants. | |

Plaintiff Bryan B. Davis ("Davis") by and through his counsel, hereby complains against

Defendants as follows:

## Parties, Jurisdiction and Venue

1.      Plaintiff Davis is a co-founder, managing member, and member of XanGo LLC's

("XanGo") board of directors.  Mr. Davis is a citizen of the State of Utah.

2. Defendant Aaron Garrity is a co-founder of XanGo and its current CEO and chairman of its board of directors. Mr. Garrity is a citizen of the State of Utah.

3. Defendant Gary Hollister is a co-founder of XanGo and a member of its board of directors. Mr. Hollister is a citizen of the State of Utah.

4. Defendant Gordon Morton is a co-founder of XanGo and a member of its board of directors. Mr. Morton is a citizen of the State of Utah.

5. Defendant Joseph Morton is a co-founder of XanGo and a member of its board of directors. Mr. Morton is a citizen of the State of Utah.

6. Defendant Kent Wood is a co-founder of XanGo and a member of its board of directors. Mr. Wood is a citizen of the State of Utah.

7. Defendant Nate Brown is XanGo's CFO. Mr. Brown is a citizen of the State of Utah.

8. Defendants Aaron Garrity, Gary Hollister, Gordon Morton, Joseph Morton, and Kent Wood are hereinafter collectively referred to as the "Manager Defendants."

9. XIC, LLC is a limited liability company organized under the laws of the State of Utah.

10. XIC II, LLC is a limited liability company organized under the laws of the State of Utah.

11. The United States District Court for the District of Utah has jurisdiction based on federal question jurisdiction pursuant to 28 U.S.C. § 1331.

12. Venue is proper in the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1391(b).

## Nature of Claims

13.　　XanGo is a multilevel marketing company formed under the laws of the State of Utah on September 11, 2002.

14.　　Both before and after XanGo was formed, Aaron Garrity, Gordon Morton, Joseph Morton, Bryan Davis, Kent Wood and Gary Hollister, (collectively "The Founders") solicited investors to provide start up monies for the company including a group named Angel Investors LLC ("Angel") which purchased a 1% membership interest in XanGo on November 21, 2002. In addition to Angel, nineteen other individuals and entities also purchased ownership interests in XanGo. The Founders, however, retained an 86% ownership interest and control of the XanGo board.

15.　　While the Founders of XanGo owed each other and XanGo the highest fiduciary duties, almost from the inception of the company Aaron Garrity saw XanGo as an opportunity to enrich and promote his personal interests.

16.　　Over the course of several years and through various fraudulent means, Mr. Garrity embezzled hundreds of thousands of dollars of XanGo assets in cash, personal expenses and gifts for family and friends.

17.　　For example, Mr. Garrity began using XanGo's assets for personal expenses and to give gifts to family, friends, and his mistress, while writing these expenses off as XanGo "business expenses."

18.　　Nate Brown set up secret founder accounts for Mr. Garrity and others to allow them to improperly spend XanGo assets.

19.     Mr. Garrity spent hundreds of thousands of dollars on clothing, suits, medical enhancements and treatments, jewelry, event tickets, watches, bicycles, electronics, media, gambling, chartered planes, personal vacations and gifts.

20.     Mr. Garrity's assistant and mistress, Andrea Waterfall, also used XanGo credit cards to spend hundreds of thousands of dollars for gifts, shopping sprees, and personal vacations.  Mr. Garrity also provided Ms. Waterfall with gifts and thousands of dollars in cash to allow her to secretly shop at XanGo's expense.

21.     Mr. Garrity also submitted to XanGo's accounting department fraudulent expense reports seeking reimbursement for personal expenses as "business expenses."  Mr. Garrity and his assistants also redacted and spoliated Mr. Garrity's credit card statements and expense reports to conceal their misconduct.

22.     When the fraudulent and spoliated expense reports were submitted to XanGo's accounting department, Mr. Garrity used his power and influence as a Founder to threaten XanGo employees into turning a blind eye to his theft.

23.     Mr. Garrity also instituted what he termed a "culture of giving" at XanGo, which meant that Mr. Garrity and those Founders and employees he determined were in his good graces, could unlimitedly use XanGo assets for their own personal benefit.

24.     At Mr. Garrity's encouragement, the Manager Defendants and a handpicked number of XanGo employees began using XanGo's assets and their corporate credit cards for their own personal benefit and the benefit of family and friends.

25.     Examples of the Manager Defendants' misuse of XanGo assets includes, for example, the Founders' purchase of millions in luxury watches; clothing; jewelry; furniture;

electronic equipment; Fender Stratocaster guitars with amplifiers; ski outfits; cycling outfits, shoes, designer sun glasses, wheel rims for their cars; beach toys in Hawaii; iPods; designer clothing; ski equipment; event tickets, convention gifts; expensive bicycles; expensive suits; construction of a suit room at Mr. Garrity's home, wave runners; home renovations, exercise equipment, Vespa scooters; grand pianos; home electronics, a theater system build-out; gift certificates; country club memberships; private chiefs, chiefs for catered events, the personal use of charter jets; exotics vacations and household and landscape services.

26.     The Manager Defendants also submitted to XanGo's accounting department fraudulent expense reports seeking reimbursement for personal expenses as "business expenses."

27.     The Manager Defendants also used XanGo employment and forced qualified distributor positions to siphon XanGo assets to family members and friends.

28.     In the spring of 2006, Angel became concerned about the management of the company and on April 18, 2006, sent a demand letter to XanGo requesting that Angel be allowed to inspect the books and records of the company.

29.     On October 11, 2006, Angel filed an action against XanGo, *Angel Investors, LLC v XanGo, LLC*, Fourth Judicial District Court for Utah County, State of Utah, Civil No. 060402848, claiming breach of contract and breaches of fiduciary duties against XanGo seeking a court ordered inspection and judicial dissolution of the company.

30.     On June 19, 2007, Angel brought a shareholder derivative suit pursuant to Utah Code Ann. § 48-2c-1701, on behalf of XanGo, alleging breaches of fiduciary duties by the Founders.  *See Angel Investors LLC v. Aaron Garrity, at el.*, Fourth Judicial District Court for

Utah County, State of Utah, Civil No. 070401904 ("*Garrity* case" or "derivative case").[1] The

Garrity case alleged that the Founders breached their fiduciary duties by misappropriating

hundreds of thousands of dollars from the company for their own personal benefit.

31.     When Mr. Davis attended XanGo manager and board meetings, the Managing

Defendants concealed their misappropriation through fraudulent books, statements, and

presentations.

32.     Throughout the lawsuit, Mr. Garrity and XanGo's counsel employed a scheme to

hide Mr. Garrity's misconduct from XanGo's members and make the litigation as expensive as

possible by concealing documents, producing hundreds of thousands of pages in nonsearchable

PDF format, and spoliating records. For example, per Mr. Garrity's instructions and at Nate

Brown's direction, XanGo produced redacted and spoliated expense reports hiding the Manager

Defendants' purchases.

33.     For example, XanGo's counsel instructed Mr. Davis to tell his partners to stop

producing expense receipts in the litigation because it was making XanGo look bad.  Mr. Davis

refused to convey XanGo's counsel's instruction, but on information and belief, XanGo's

counsel gave that instruction to some or all of the Manager Defendants.

---

[1] On June 8 2009, Angel also filed an action entitled *Angel Investors, LLC v. Robert Conlee, Craig Hale, Dennis Grimmer, Dee Grimmer, Kent Wood, Gary Hollister, Aaron Garrity, Bryan Davis, Joseph Morton, Gordon Morton, XanGo LLC, Tiffany Garrity, Andrea Waterfall, Melanie Wood, and Beverly Hollister*, Fourth Judicial District Court for Utah County, State of Utah, Civil No. 090402211.  This third lawsuit alleged that prior to 2008, XanGo made distributions to members for profits and taxes, but after learning that Angel was using the distributions to fund the litigation against XanGo, the Founders caused XanGo to cease making distributions in order "to retaliate against Angel for pursuing its statutory rights."

34.     XanGo hired John P. Harrington to serve as an "independent evaluator."  In turn, Mr. Harrington purportedly retained his own firm, Holland & Hart, to serve as "outside counsel" for the Special Litigation Committee ("SLC").  XanGo also hired an accounting firm to review the credit card records for each of the Founders and evaluated the classification of purchases that had previously been assigned to XanGo.

35.     XanGo claimed that Mr. Harrington was independent and that neither the Founders nor XanGo's counsel had any influence of the process.  In fact, unbeknownst to Mr. Davis, Mr. Harrington's evaluation was heavily influenced and controlled by XanGo's counsel and Mr. Garrity to wrongfully absolve the Manager Defendants of any wrongdoing.

36.     Mr. Harrington and XanGo's counsel began a back-and-forth process attempting to invent justifications for personal expenses as "business expenses" or "additional compensation."  Mr. Harrington was more than generous in granting suspect purchases a "business expense" status.

37.     Nate Brown advised XanGo's Founders to rework their expense reports reassigning personal expenses as "business expenses."

38.     At the end of the independent evaluation process, it became clear that notwithstanding Mr. Harrington's generous treatment, Mr. Garrity's personal expenses were of such a magnitude that they could not all possibly be re-categorized as "business expenses" or "additional compensation."

39.     Faced with this quandary, Mr. Harrington interviewed Mr. Davis.  Mr. Harrington asked Mr. Davis if he was aware of how much Mr. Garrity spent using XanGo's assets.  Mr.

Davis replied that he did not. Mr. Harrington then disclosed some of the misuse of XanGo's assets to Mr. Davis. Mr. Davis was shocked and upset to learn of the waste and mismanagement.

40. XanGo's counsel and Nate Brown told Mr. Davis that they were re-categorizing Mr. Garrity's personal expenses as "compensation" approved by the other Founders after the fact. Mr. Brown told Mr. Davis that he needed to help the team by incurring additional tax liability on the books, but that XanGo would pay the tax increase.

41. Mr. Davis objected to re-categorization and specifically stated to XanGo's counsel that he believed that the Founders needed to meet and discuss the situation and that he was not happy about the proposed strategy because he did not believe it was fair, accurate or honest.

42. XanGo's founders later held a meeting where Nate Brown stated that the re-categorization had been completed. Mr. Davis again objected. XanGo counsel, Michelle Wilson, told Mr. Davis not to worry about it because XanGo would pay the additional tax and that the expense had to be adjusted for the purposes of the litigation. The Managing Defendants adamantly stated that XanGo was their company and that no one would tell them how to run it or how to spend their money.

43. Subsequently, Nate Brown refused Mr. Davis' request to review Mr. Garrity's expense reports, claiming that Mr. Garrity's permission was required.

44. Mr. Davis became aware that Mr. Brown was instructed by Mr. Garrity to not to disclose this information nor any additional financial information.

45.     XanGo counsel represented that Mr. Garrity's revised expenses were within normal limits and that no accounting rules had been violated.   Mr. Garrity was elated by this advice, believing that his mismanagement was covered up.

46.     On July 29, 2010, XanGo and Angel announced that they resolved all disputes and litigation between them through a confidential settlement.

47.     After the litigation had been settled, Mr. Davis believed, based on Mr. Garrity's and the remaining Manager Defendants' promises, that XanGo would be appropriately managed and its assets protected from that point forward.  XanGo's Founders also committed to XanGo's banking partners that XanGo's members would receive no distributions until certain obligations were met.

48.     Due to the financial circumstances, XanGo's bank placed special conditions on XanGo's line of credit.  For example, the bank demanded that XanGo's Founders personally guarantee the company line of credit.  Mr. Davis told Nate Brown that he would not sign such an agreement.

49.     Mr. Garrity and Nate Brown pressured Mr. Davis into signing claiming that if he did not sign the company would fail for lack of funds.  Mr. Garrity and Mr. Brown guaranteed Mr. Davis that XanGo would fulfill its obligations and that he did not have to worry about being personally liable on the note and that XanGo would pay all its bills.

50.     Mr. Davis later discovered, however, that Mr. Garrity and the Manager Defendants had no intentions of ceasing their attempts to illicitly enrich themselves from XanGo's assets.

51.     Mr. Garrity and the Manager Defendants never repaid the waste and mismanagement identified in the Angel litigation.  Instead, the Manager Defendants pursued the very strategy of waste and mismanagement that they previously employed.  Mr. Garrity's personal misuse of XanGo assets was re-categorized as "compensation" and allocated to the other Founders.  XanGo then paid the additional tax liability on behalf the Founders.

52.     The Manager Defendants also continued to misappropriate XanGo assets and use XanGo credit cards to pay for personal expenses.

53.     Furthermore, in direct contravention to its banking agreements, the Manager Defendants conspired to give themselves illicit distributions through a tax fraud scheme.

54.     Because XanGo's members were prohibited from receiving distributions, Kent Wood, Mr. Garrity and Mr. Brown caused XanGo's accounting department to substantially overpay XanGo's and the Manager Defendants' individual tax payments.  Through this scheme, at the end of the year, each of the Manager Defendants' received a "distribution" in the form of a large tax rebate.

55.     The Manager Defendants also formed various competing companies with XanGo assets.  Through these companies, the Managing Defendants were able to divert XanGo resources to their own personal benefit.

56.     When Mr. Davis objected to the continued waste and mismanagement, the Manager Defendants took steps to freeze him out of the company.

57.     Mr. Davis was intentionally excluded entirely from the day-to-day functions/operations of XanGo, removed from Founder emails, daily sales reports, and  uninvited to corporate and business functions, prohibited from talking to distributors and/or attending

promotional events, removed from speaking assignments, taken off travel schedules and excluded from operational meetings.

58.     At XanGo board meetings the Managing Defendants ignored Mr. Davis' objections to wrongful conduct, falsifying board minutes to reflect unanimous consent to actions to which Mr. Davis had voiced objections.

59.     XanGo employees were told not to talk to Mr. Davis under penalty of termination. The Manager Defendants also falsely claimed to XanGo employees that Mr. Davis had resigned his position at XanGo and disparaged Mr. Davis to XanGo employees.

60.     The Manager Defendants also caused XanGo to withhold bonus/distribution payments to Mr. Davis as well as discontinuing employee benefits.

61.     The Managing Defendants offered to buy a portion of Mr. Davis' interest in XanGo at a fraction of the interest's value. The Managing Defendants' actions eliminated a viable market for Mr. Davis' shares because Mr. Davis cannot sell his shares without all the Managing Defendants' authorization.

62.     Notwithstanding this retaliation, Mr. Davis continued to promote the interests of XanGo to foreign dignitaries and countries, host dinners and attend various international functions on behalf of and as representative of the interests of XanGo.

63.     The Managing Defendants then further retaliated against Mr. Davis by disinviting him from corporate events. The Managing Defendants began claiming that Mr. Davis had resigned or had been terminated. Mr. Wood also claimed he and Mr. Garrity had decided it was not necessary for Mr. Davis to attend events that all of the Founders attended. In fact, Mr. Davis was ready willing and able to attend XanGo events and was simply disinvited from doing so.

64.     On information and belief, Mr. Garrity has also misused XanGo's security department to retaliate against Mr. Davis and other individuals.

65.     For example, from 2007 through 2010, Mr. Garrity made numerous requests of XanGo's security department to investigate individuals who were in opposition to him, including Angel, leaders and founders of competing MLM'S, and XanGo distributors and employees.  Mr. Garrity asked Justin Barrett to use his access to law enforcement databases to find information on these individuals that was not on public record, which information Mr. Garrity could then use to his advantage.

66.     Mr. Garrity also instructed XanGo's security team to follow and investigate Gordon Morton.

67.     At the end 2009, Mr. Garrity also requested that the XanGo Security Department obtain a non-traceable wireless accounts for him for the purpose of online corporate intelligence gathering, dissemination of information and posting defamatory comments about competitors, distributors, employees and others.  A bogus account was illegally created under the fictitious name "John Gable."  Mr. Garrity paid for the wireless account by using cash advances paid through Ms. Waterfall.  Later this process handed over to Mr. Gary Hollister who paid the cash advance through his assistant Tristan Chile.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

68.     Plaintiff incorporates by this reference the other allegations set forth in this Complaint.

69.     XanGo's Operating Agreement and the amendments thereto are contracts between XanGo's members, including but not limited to, Mr. Davis and the Managing Defendants.

70.     The Managing Defendants breached XanGo's Operating Agreement in various ways, including but not limited to:

    a.      Failing to properly allocate XanGo's Profit and Loss and allocating among the Members their respective profits in proportion to their Membership Interests at the end of each year.

    b.      Failing to make proper distributions to XanGo's Members including Mr. Davis.

    c.      Breaching their fiduciary duties.

    d.      Failing to keep accurate books and records.

    e.      Denying Mr. Davis access to the books and records of the Company.

    f.      Committing accounting fraud.

    g.      Filing false tax returns on behalf of the Company.

    h.      Wasting, mismanaging and misusing XanGo's assets and intellectual property.

    i.      Purporting to dilute Mr. Davis' membership in XanGo from Class A membership interests to Class C membership interests.

71.     Mr. Davis has fulfilled his obligations under XanGo's Operating Agreement.

72.     The Manager Defendants' breach of contract has damaged Mr. Davis in an amount to be proven at trial, but not less than $3,000,000.00.

73.     Mr. Davis also had an oral employment agreement with XanGo.

13

74.     The Managing Defendants have caused XanGo to breach its employment agreement with Mr. Davis and constructively discharged him in retaliation for his refusal to consent to their waste and mismanagement.

75.     The Manager Defendants' actions have damaged Mr. Davis in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

76.     Plaintiff incorporates by this reference the other allegations set forth in this Complaint.

77.     All contracts include the implied covenant of good faith and fair dealing that requires the parties to the contract to act in good faith and take the necessary steps to fulfill and honor their respective contractual obligations.

78.     Through XanGo's Operating Agreement and his employment agreement, Mr. Davis expected to enjoy the benefits, compensation, membership and employment in being a member and employee of a properly managed company.

79.     The Manager Defendants have breached the covenant of good faith and fair dealing through their acts of waste, mismanagement, fraud and retaliation.

80.     The Managing Defendants' breaches of the covenant of good faith and fair dealing have damaged Mr. Davis.

81.     Mr. Davis is entitled to damages in an amount to be proven at trial, but not less than $3,000,000.00.

14

## THIRD CAUSE OF ACTION
### (INTENTIONAL OR NEGLIGENT MISREPRESENTATION)

82.     Plaintiff incorporates by this reference the other allegations set forth in this Complaint.

83.     The Manager Defendants and Mr. Brown have intentionally or negligently misrepresented numerous facts to Mr. Davis that they had a fiduciary duty to disclose including but not limited to:

      a.      On a monthly basis beginning in at least as early as the year 2005, the Manager Defendants submitted to XanGo's accounting department credit card statements and expense reports that routinely claimed that personal expenses were legitimate business expenses.  Mr. Davis expects that discovery will reveal the date, author and recipients of each fraudulent expense report.  Each of the Manager Defendants failed to disclose to Mr. Davis that they were engaged in fraud, waste and mismanagement of XanGo's assets.  The Manager Defendants concealed their fraudulent activities by failing to disclose their expense reports or misconduct to Mr. Davis during the monthly expense report review process, in regular management meetings or at XanGo board meetings.

      b.      In July 2009, Mr. Garrity misrepresented to Mr. Davis that the allegations in the Angel lawsuit were untrue.

      c.      On or about 2010, Mr. Garrity and Mr. J. Morton misrepresented to Mr. Davis that XanGo's assets were not being used to create a new retail drink

line. In fact, XanGo's assets, personal, intellectual property and vendors were all being used to create a competitive product.

d.     In the spring of 2006, at building A on XanGo's Lehi, Utah campus, Mr. Garrity misrepresented to Mr. Davis that he was not involved in an intimate relationship with his assistant Andrea Waterfall.

e.     In the spring of 2006, Mr. Hollister failed to disclose to Mr. Davis that Mr. Garrity had approached him and had admitted to misconduct, and tendered his resignation from XanGo.

f.     Mr. Garrity, Mr. Brown and Mr. Wood failed to disclose to Mr. Davis that they were involved in bribing Russian customs officials. On or about the week of July 28, 2012, Jason Pierce approached Mr. Davis and informed him that XanGo was involved in a bribing scheme using organized criminal elements to ship XanGo product into Russia without paying Russian customs taxes. Mr. Pierce informed Mr. Davis that he had reported the misconduct to Mr. Brown and that Mr. Brown had told him to "shut the f*** up" about the subject. When Mr. Davis called XanGo from Russia to inquire about the allegations he had heard from Mr. Pierce, Mr. Garrity immediately terminated Mr. Davis' Russian responsibilities and cancelled his scheduled trips and events in Russia on behalf of XanGo's Russian distributors.

g.     In 2009, Mr. Davis approached Mr. Wood about his plans to build a new home. Mr. Davis asked Mr. Wood whether XanGo was in a secure

financial position.  Mr. Wood falsely stated to Mr. Davis that everything was fine with XanGo and that XanGo's financial situation was secure.

h. In the fall of 2011 and the fall of 2012, Mr. Brown gave Mr. Davis equity and financial statements that falsely misrepresented XanGo's finances.

i. On a monthly basis beginning in at least as early as the year 2005, the Manager Defendants caused XanGo to produce and send to Mr. Davis monthly sales reports that falsely claimed that XanGo distributors who were family members or friends of the Manager Defendants had sold more XanGo products than they had actually sold or paid for.

84. Mr. Davis relied on each of the Manager Defendants' and Mr. Brown's representations to his determent through various ways, including but not limited to, promoting and representing to XanGo's distributors and the public that XanGo was a properly run company, incurring additional financial obligations, and providing employment services to XanGo believing that he was working for a properly run business.

85. Mr. Davis has been damaged and continues to sustain damages for the Managing Defendants' and Mr. Brown's negligent and intentional misrepresentations in an amount to be determined at trial, but in no event less than $3,000,000.00.

## FOURTH CAUSE OF ACTION
### (FRAUD)

86. Plaintiff incorporates by this reference the other allegations set forth in this Complaint.

87.     The Manager Defendants and Mr. Brown made numerous false representations or omissions including but not limited to:

a.      On a monthly basis beginning in at least as early as the year 2005, the Manager Defendants submitted to XanGo's accounting department credit card statements and expense reports that routinely claimed that personal expenses were legitimate business expenses.  Mr. Davis expects that discovery will reveal the date, author and recipients of each fraudulent expense report.  Each of the Manager Defendants failed to disclose to Mr. Davis that they were engaged in fraud, waste and mismanagement of the XanGo's assets.  The Manager Defendants concealed their fraudulent activities by failing to disclose their expense reports or misconduct to Mr. Davis during the monthly expense report review process, in regular management meetings or at XanGo board meetings.

b.      In July 2009, Mr. Garrity misrepresented to Mr. Davis that the allegations in the Angel lawsuit were untrue.

c.      On or about 2010, Mr. Garrity and Mr. J. Morton misrepresented to Mr. Davis that XanGo's assets were not being used to create a new retail drink line.  In fact, XanGo's assets, personal, intellectual property and vendors were all being used to create a competitive product.

d.      In the spring of 2006, at building A on XanGo's Lehi, Utah campus, Mr. Garrity misrepresented to Mr. Davis that he was not involved in an intimate relationship with his assistant Andrea Waterfall.

e.  In the spring of 2006, Mr. Hollister failed to disclose to Mr. Davis that Mr. Garrity had approached him and had admitted to misconduct, and tendered his resignation from XanGo. Mr. Garrity, Mr. Brown and Mr. Wood failed to disclose to Mr. Davis that they were involved in bribing Russian customs officials. On or about the week of July 28, 2012, Jason Pierce approached Mr. Davis and informed him that XanGo was involved in a bribing scheme using organized criminal elements to ship XanGo product into Russia without paying Russian customs taxes. Mr. Pierce informed Mr. Davis that he had reported the misconduct to Mr. Brown and that Mr. Brown had told him to "shut the f*** up" about the subject. When Mr. Davis called XanGo from Russia to inquire about the allegations he had heard from Mr. Pierce, Mr. Garrity immediately terminated Mr. Davis' Russian responsibilities and cancelled his scheduled trips and events in Russia on behalf of XanGo's Russian distributors.

f.  In 2009, Mr. Davis approached Mr. Wood about his plans to build a new home. Mr. Davis asked Mr. Wood whether XanGo was in a secure financial position. Mr. Wood falsely stated to Mr. Davis that everything was fine with XanGo and that XanGo's financial situation was secure.

g.  In the fall of 2011 and the fall of 2012, Mr. Brown gave Mr. Davis equity and financial statements that falsely misrepresented XanGo's finances.

h.  On a monthly basis beginning in at least as early as the year 2005, the Manager Defendants caused XanGo to produce and send to Mr. Davis

monthly sales reports that falsely claimed that XanGo distributors who
were family members or friends of the Manager Defendants had sold more
XanGo products than they had actually sold or paid for.

88.     Each of the above representations or omissions was materially false.

89.     The Manager Defendants and Mr. Brown had knowledge of the falsity of each of
the representations or omissions and intended for Mr. Davis to rely upon the false representations
or omissions.

90.     Mr. Davis was unaware of the falsity of the above representations or omissions
and relied on the Manager Defendants and Mr. Brown to provide him with accurate information
regarding XanGo.

91.     Mr. Davis had a right to rely on the Manager Defendants' and Mr. Brown's
fraudulent representations and omissions given the fiduciary duties the parties held to each other
and XanGo.

92.     Mr. Davis relied on each of the Manager Defendants' and Mr. Brown's
misrepresentations and omissions to his determent through various ways, including but not
limited to, promoting and representing to XanGo's distributors and the public that XanGo was a
properly run company, incurring additional financial obligations, and providing employment
services to XanGo believing that he was working for a properly run business.

93.     Mr. Davis has been damaged and continues to sustain damages in an amount to be
determined at trial, but in no event less than $3,000,000.00.

## FIFTH CAUSE OF ACTION
## (FRAUDULENT INDUCEMENT AND CONCEALMENT)

94.     Plaintiff incorporates by this reference the other allegations set forth in this Complaint.

95.     The Manager Defendants and Mr. Brown have employed a scheme to defraud designed to loot XanGo assets for their own benefit.  The fraudulent scheme includes the use of material misrepresentations and omissions (fraudulent concealment of material facts and information unequally in the Manager Defendants' and Mr. Brown's possession) and the fraudulent inducement to enter into contracts as noted above.

96.     With regard to each and every fact or information concealed from Mr. Davis, the Manager Defendants and Mr. Brown had a duty to disclose the material facts and information withheld from Mr. Davis.

97.     Mr. Davis reasonably and justifiably relied to his detriment upon the Manager Defendants' and Mr. Brown's false and fraudulent representations, actions, omissions and concealments and, as a consequence, entered into contracts, including but not limited to, personally guaranteeing XanGo's line of credit.

98.     The Manager Defendants and Mr. Brown have engaged in the above described fraudulent activity since at least 2006.

99.     As a direct and proximate result of Mr. Davis's detrimental reliance upon the Manager Defendants' and Mr. Brown's false and fraudulent representations, actions, omissions and concealments, Mr. Davis has been damaged and continues to sustain damages in an amount to be determined at trial, but in no event less than $3,000,000.00.

## SIXTH CAUSE OF ACTION
## (CIVIL CONSPIRACY)

100.    Plaintiff incorporates by this reference the other allegations set forth in this Complaint.

101.    The Manager Defendants, Mr. Brown and others to be determined through discovery, combined together with the objective of employing a Fraud Scheme designed to loot XanGo of its assets.

102.    The Manager Defendants, Mr. Brown, and others to be determined through discovery, all combined together with the objective of hiding the true facts of the scheme to defraud from Mr. Davis.

103.    The Manager Defendants, Mr. Brown, and others to be determined through discovery, agreed to a course of action amongst themselves to cover up the true nature of the scheme to defraud.

104.    As an overt act in furtherance of such conspiracy, the Manager Defendants, Mr. Brown, and others to be determined through discovery, negligently or intentionally misrepresented the true facts about the scheme to defraud to Mr. Davis.

105.    As a result of conspiracy between the Manager Defendants, Mr. Brown, and others to be determined through discovery, Mr. Davis has been damaged and continues to sustain damages in an amount to be determined at trial, but in no event less than $3,000,000.00.

## SEVENTH CAUSE OF ACTION
## (VIOLATION OF 18 U.S.C. §§ 1962(c) and (d))

106.　Plaintiff incorporates by this reference the other allegations set forth in this Complaint.

107.　18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

108.　18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

109.　Mr. Davis is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

110.　Aaron Garrity, Kent Wood, Joe Morton, Gordon Morton, Gary Hollister, and Nate Brown ("RICO Defendants") are each individually "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

111.　XanGo constitutes an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "XanGo Enterprise"). The XanGo Enterprise is directed by the Manager Defendants who financed, developed, and implemented the RICO Fraud Scheme.

112.　Under the veil of the legitimate XanGo business, the RICO Defendants used the XanGo Enterprise to fraudulently loot XanGo's assets thereby depriving its owners and distributors of compensation. The RICO Defendants thereafter used the profits from their fraudulent transactions to perpetuate accounting fraud, tax fraud/evasion and other misconduct in furtherance of scheme to defraud.

113.     The RICO Defendants solicited XanGo employees, agents and separate third parties to assist in the fraudulent transactions and to fulfill necessary roles in the implementation of the scheme to defraud.

114.     The common purpose of each of the members of the XanGo Enterprise was to fraudulently induce Mr. Davis and other victims to participate in the scheme to defraud so that the RICO Defendants could profit thereby.  The RICO Defendants have engaged in racketeering and other activities affecting interstate commerce since at least 2006.

115.     The Manager Defendants have employed a similar pattern of fraudulent activity in their dealings with at least two other companies named XIC and XIC II.

116.     The RICO Defendants violated 18 U.S.C. 1961(1) by conduct in engaging in "racketeering activity" including:

        a.     Mail fraud.

        b.     Wire fraud.

        c.     Racketeering activity.

        d.     Money Laundering.

        e.     Financial institution fraud.

117.     In violation of 18 U.S.C. § 1962(c) the RICO Defendants conducted and/or participated in the conduct of the XanGo Enterprises' affairs, directly or indirectly, through a pattern of racketeering activity.  The RICO Defendants participated in the operation or management of the XanGo Enterprise, by, among other things, providing its agents, including but not limited to, XanGo employees, with fraudulent documents and contracts.

118.    The pattern of racketeering activity consisted of the RICO Defendants aiding and abetting the commission of countless acts of mail fraud, wire fraud, racketeering activity, money laundering, engaging in monetary transactions in property derived from specified unlawful activity, financial institution fraud, and retaliating against a witness, victim, or an informant in violation of 18 U.S.C §§ 1341, 1343, 1344, 1952, 1956, 1957.

119.    Specifically, the RICO Defendants engaged in a scheme or artifice to defraud Mr. Davis or to obtain money or property from Mr. Davis by means of false or fraudulent pretenses, representations, or promise, including but not limited to:

f.      On a monthly basis beginning in at least as early as the year 2005, the Manager Defendants submitted to XanGo's accounting department credit card statements and expense reports that routinely claimed that personal expenses were legitimate business expenses.  Mr. Davis expects that discovery will reveal the date, author and recipients of each fraudulent expense report.  Each of the Manager Defendants failed to disclose to Mr. Davis that they were engaged in fraud, waste and mismanagement of the XanGo's assets.  The Manager Defendants concealed their fraudulent activities by failing to disclose their expense reports or misconduct to Mr. Davis during the monthly expense report review process, in regular management meetings or at XanGo board meetings.

g.      Misrepresenting to Mr. Davis that the allegations in the Angel lawsuit were untrue.

h.     Misrepresenting to Mr. Davis that XanGo's assets were not being used to create a new retail drink line.  In fact, XanGo's assets, personal, intellectual property and vendors were all being used to create a competitive product.

i.     Mr. Garrity misrepresented to Mr. Davis that he was not involved in an intimate relationship with his assistant Andrea Waterfall.

j.     Mr. Hollister failed to disclose to Mr. Davis that Mr. Garrity had approached him and had admitted to misconduct, and tendered his resignation from XanGo.

k.     Mr. Garrity, Mr. Brown and Mr. Wood failed to disclose to Mr. Davis that they were involved in bribing Russian customs officials.

l.     Mr. Brown gave Mr. Davis equity and financial statements that falsely misrepresented XanGo's finances.

m.     On a monthly basis beginning in at least as early as the year 2005, the Manager Defendants caused XanGo to produce and send to Mr. Davis monthly sales reports that falsely claimed that XanGo distributors who were family members or friends of the Manager Defendants had sold more XanGo products than they had actually sold or paid for.

120.     In furtherance of this scheme or artifice, the RICO Defendants transmitted or caused to be transmitted by means of wire communication in interstate commerce, the following writings, and also caused numerous documents, including but not limited to, the following matters and things to be placed in any post office or authorized depository, or deposited or

caused to be deposited the following matters or things to be sent or delivered by a private or

commercial interstate carrier:

a.    On or about, October 14, 2011 at the direction of one or all of the RICO

Defendants, King & McCleary LLC caused XanGo to prepare and file

fraudulent K-1's and tax returns though interstate wire transmission or

U.S. Mail.

b.    On or about, October 15, 2010 at the direction of one or all of the RICO

Defendants, King & McCleary LLC caused XanGo to prepare and file

fraudulent K-1's and tax returns though interstate wire transmission or

U.S. Mail.

c.    On or about, October 15, 2009 at the direction of one or all of the RICO

Defendants, King & McCleary LLC caused XanGo to prepare and file

fraudulent K-1's and tax returns though interstate wire transmission or

U.S. Mail.

d.    On or about, October 15, 2008 at the direction of one or all of the RICO

Defendants, King & McCleary LLC caused XanGo to prepare and file

fraudulent K-1's and tax returns though interstate wire transmission or

U.S. Mail.

e.    On numerous occasions, the specific dates of which will be obtained

through discovery, one or all of the RICO Defendants caused XanGo to

send to Mr. Davis though interstate wire transmission a fraudulent XanGo

sales report.

f.	On a monthly basis beginning in at least as early as the year 2006, the Manager Defendants submitted to XanGo's accounting department corporate credit card statements claiming personal expenses as business expenses. On information and belief, the credit card statements reflecting the Manager Defendants' fraudulent activities were transmitted to XanGo via U.S. Mail and/or interstate wire transmission. Mr. Davis expects that discovery will reveal the date and mode of transmission of each of the credit card statements.

g.	On a monthly basis beginning in at least as early as the year 2006, the Manager Defendants submitted to XanGo's accounting department expense reports claiming personal expenses as business expenses. On information and belief, the expense reports and reimbursement checks and/or wire payments submitted by and paid to the Manager Defendants' were transmitted via U.S. Mail and/or interstate wire transmission. Mr. Davis expects that discovery will reveal the date and mode of transmission of each expense report or reimbursement payment.

h.	At the end 2009, Mr. Garrity caused Justin Barrett to submit a false wireless account application via interstate wire communication in the fictitious name John Gable at a Spanish Fork, Utah Sprint Wireless Store. On information and belief, Mr. Garrity used this bogus wireless account to send numerous false and misleading statements via interstate wire transmission.

121.     In violation of 18 U.S.C §1344, the RICO Defendants knowingly executed a scheme or artifice to defraud a Chase Bank by representing that XanGo intended to cease distributions to its members as a condition for loans and the XanGo line of credit.  In fact, the RICO Defendants never intended keep this promise.  Instead, the Managing Defendants provided themselves secret distributions through a tax overpayment scheme.

122.     As part of the scheme, the RICO Defendants cause XanGo to significantly overpay its yearly federal taxes.  When XanGo received a large tax return, the RICO Defendants' caused XanGo to distribute this money to the Manager Defendants as a secret distribution.

123.     In violation of 18 U.S.C §1344, the Manager Defendants obtained moneys, funds, credits, assets, or other property owned under the control of Chase Bank, by means of these same false or fraudulent pretenses, representations, or promises.

124.     The RICO Defendants also used XanGo's misappropriated assets to perpetuate this fraud on other banking institutions to wrongfully obtain loans, moneys, funds, credits, assets, or other property owned or under the control of the bank.

125.     For example, Mr. Garrity used his misappropriation of XanGo's assets to obtain, use and benefit from an American Express Black Card.

126.     In violation of 18 U.S.C. § 1952(a), the RICO Defendants engaged in interstate commerce, with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity including money laundering.

127.     18 U.S.C. § 1956(a)(1) makes it unlawful to conduct a financial transaction knowing "that the financial transaction represents the proceeds of some form of unlawful

activity, conducts or attempts to conduct such a financial transaction which in fact involves the

proceeds of specified unlawful activity—

    (A)
        (i) with the intent to promote the carrying on of specified unlawful activity; or
        (ii) with intent to engage in conduct constituting a violation of section 7201 or
        7206 of the Internal Revenue Code of 1986; or

    (B) knowing that the transaction is designed in whole or in part—
        (i) to conceal or disguise the nature, the location, the source, the ownership, or the
        control of the proceeds of specified unlawful activity; or
        (ii) to avoid a transaction reporting requirement under State or Federal law,

128.    The term "financial transaction" means

    (A) a transaction which in any way or degree affects interstate or foreign commerce
        (i) involving the movement of funds by wire or other means or
        (ii) involving one or more monetary instruments, or
        (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft,

    (B) a transaction involving the use of a financial institution which is engaged in, or the
    activities of which affect, interstate or foreign commerce in any way or degree.

129.    That portion of the "Money Laundering Control Act of 1986" found in 18 U.S.C.

§ 1956(c), states:

    As used in this section—

        (7) the term "specified unlawful activity" means—

        (A) any act or activity constituting an offense listed in section 1961(1) of
        this title except an act which is indictable under subchapter II of chapter
        53 of title 31 . . .

        (B)
        (iv) bribery of a public official, or the misappropriation, theft, or
        embezzlement of public funds by or for the benefit of a public official[.]

130.    18 U.S.C. § 1957(a), states: Whoever[…] knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from a specified unlawful activity, shall be punished as provided in subsection (b).

131.    18 U.S.C. § 1957(f) states that the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.

132.    In violation of 18 U.S.C. 1952, 1956, and 1957, as noted above, the RICO Defendants were involved in numerous acts money laundering and bribery of foreign officials with the intent to promote the carrying on of specified unlawful activities of mail fraud, wire fraud, tax evasion and tax fraud, with knowledge that the transactions were designed to conceal or disguise the nature, location, source, ownership or control of proceeds of the specified unlawful activity.

133.    The acts of racketeering activity referred to in the previous paragraphs constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants, common victims, a common method of commission, and the common purpose and common result of fraudulently inducing Mr. Davis and other XanGo members, among others, to participate in a scheme to defraud Mr. Davis, XanGo's members and XanGo's distributors through similar promises and agreements.

134.    The Manager Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

135.    As a result of the RICO Defendants' violations of 18 U.S.C. § 1962(c), Mr. Davis has been damaged by unknowingly participating in the scheme to defraud; by losing the value of

his interest in XanGo; by being undercompensated for the time and resources he spent building XanGo; by being denied his contractual rights; by being frozen out of the company he co-founded; and by suffering damage to his business reputation.

136.     As a direct and proximate result of the RICO Defendants' violation of 18 U.S.C. § 1962(d) and by reason of the RICO Defendants' conspiracy to violate 18 U.S.C. § 1962(c), Mr. Davis has been injured in an amount to be proven at trial, but not less than $3,000,000.00.

137.     As a result of the Manager Defendants' violation of 18 U.S.C. §1962(c) and (d) and 1964(c) Davis is entitled to three-fold his damages and the costs of suit, including a reasonable attorney's fee.

## EIGHTH CAUSE OF ACTION
### (TORTUOUS INTERFERENCE WITH CURRENT AND PROSPECTIVE ECONOMIC ADVANTAGE)

138.     Plaintiff incorporates by this reference the other allegations set forth in this Complaint.

139.     As noted above, Mr. Davis entered into an employment agreement and XanGo's Operating Agreement.

140.     The Manager Defendants knew of the existence of these contracts and as part of their attempts to oppress Mr. Davis as a minority shareholder caused XanGo to breach its agreements with Mr. Davis.

141.     The Manager Defendants' conduct prevented the performance of XanGo's obligations to Mr. Davis.

142.     In addition, the Manager Defendants actively sought to damage Mr. Davis' business reputation in the network marketing community.

143.     The Manager Defendants are aware that Mr. Davis has beneficial business relationships in the network marketing community.

144.     As part of their attempts to oppress Mr. Davis as a minority shareholder, the Manager Defendants made numerous false statements to XanGo employees and distributors with the intent to damage Mr. Davis' business reputation.

145.     The Manager Defendants' conduct has directly and proximately harmed Mr. Davis' business relationships.

146.     As a direct and proximate result of the Manager Defendants' conduct, Mr. Davis has been damaged and continues to sustain damages in an amount to be determined at trial, but in no event less than $100,000.00.

## NINTH CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY)

147.     Plaintiff incorporates by this reference the other allegations set forth in this Complaint.

148.     The Manager Defendants owed the highest fiduciary duties to Mr. Davis as a co-founder and managing member of XanGo.

149.     The Manager Defendants breached their fiduciary duties to Mr. Davis when they retaliated against him for challenging their self-interested transactions and misconduct.

150.     For example, the Manager Defendants individually or collectively committed numerous retaliatory acts which constitute a breach of their fiduciary duties, including but not limited to:

         a.     causing XanGo to wrongfully breach its agreements with Mr. Davis;

33

b. failing to make full distributions;

c. funneling XanGo assets to companies separately owned or controlled by the Manager Defendants;

d. making loans from XanGo assets to companies separately owned or controlled by the Manager Defendants;

e. engaging in conduct with the intent of squeezing Mr. Davis out of XanGo;

f. engaging in conduct designed to hide XanGo corporate profits;

g. engaging in conduct designed to conceal tax fraud;

h. denying Mr. Davis full access to the books and records of the company;

i. excluding Davis from the day-to-day operations of the company;

j. giving Mr. Davis fraudulent documents claiming that they were legitimate corporate records;

k. making material misstatements of fact regarding XanGo, its shareholders, the nature of self-interested transactions, and Mr. Davis's role in the company.

l. Removing him from the company schedule for distributor meeting so he would have no contact or limited European Interest.

m. Purporting to dilute Mr. Davis' membership in XanGo from Class A membership interests to Class C membership interests.

151. As a result of the Manager Defendants' breaches of their fiduciary duties, Mr. Davis has been damaged.

152. Mr. Davis is entitled to damages as a result of the Managing Defendants' breaches of their fiduciary duties in an amount to be proven at trial, but not less than $3,000,000.00.

**TENTH CAUSE OF ACTION**
**(MINORITY SHAREHOLDER OPPRESSION)**

153. Plaintiff incorporates by this reference the other allegations set forth in this Complaint.

154. The Manager Defendants owed the highest fiduciary duties to Mr. Davis as a co-founder and minority member.

155. Mr. Davis, as a co-founder and managing member of XanGo, had reasonable expectations regarding his role and ownership interest in XanGo.

156. The Manager Defendants committed numerous acts that amount to burdensome, harsh and/or wrongful conduct that violated Mr. Davis's reasonable expectations as a minority member, including but not limited to:

    a.    causing XanGo to wrongfully breach its agreements with Mr. Davis;

    b.    failing to make full distributions;

    c.    funneling XanGo assets to companies separately owned or controlled by the Manager Defendants;

    d.    making loans from XanGo assets to companies separately owned or controlled by the Manager Defendants;

    e.    engaging in conduct with the intent of squeezing Mr. Davis out of XanGo;

    f.    engaging in conduct designed to hide XanGo corporate profits;

    g.    engaging in conduct designed to conceal tax fraud;

      h.      denying Mr. Davis full access to the books and records of the company;

      i.      excluding Davis from the day-to-day operations of the company;

      j.      giving Mr. Davis fraudulent documents claiming that they were legitimate corporate records;

      k.      making material misstatements of fact regarding XanGo, its shareholders, the nature of self-interested transactions, and Mr. Davis role in the company;

      l.      Removing him from the company schedule for distributor meeting so he would have no contact or limited European Interest.

      m.      Purporting to dilute Mr. Davis' membership in XanGo from Class A membership interests to Class C membership interests.

157.    As a result of the Manager Defendants' acts of oppression, Mr. Davis has been damaged.

158.    Mr. Davis is entitled to damages as a result of the Manager Defendants' acts of oppression in an amount to be proven at trial, but not less than $3,000,000.00.

## ELEVENTH CAUSE OF ACTION
### (CONSTRUCTIVE TRUST)

159.    Plaintiff incorporates by this reference the other allegations set forth in this Complaint.

160.    By virtue of settlement agreements that relied on the Manager Defendants' good faith accounting of personal expenses, the Manager Defendants were placed in a position of trust and fiduciary duty vis-à-vis Mr. Davis.

161.     The Manager Defendants fraudulently reported their personal expenses by providing false and misleading information and have not provided Mr. Davis the opportunity to do a full audit of untainted XanGo financial documents.

162.     As a result, the Manager Defendants have an equitable duty to fully account for their personal expenses and any illegal bribes or payments.

163.     The Court should place a constructive trust over profits wrongfully diverted and illegal payments made by the Manager Defendants.

WHEREFORE, Plaintiff Davis demands judgment as follows:

A.     Damages and treble damages in an amount to be proven at trial but not less than $3,000,000.00;

B.     That Manager Defendants be stripped of any managerial role in XanGo;

C.     Appropriate punitive damages;

D.     An award of attorneys' fees and costs;

E.     Pre- and post-judgment interest at the highest rate allowed by law; and

F.     Any other relief the Court deems to be just and equitable.

DATED this 16th day of May, 2013.

WOOD BALMFORTH LLC


/s/ Stephen Q. Wood
Mary Anne Q. Wood
Stephen Q. Wood
60 East South Temple Street, Suite 500
Salt Lake City, Utah 84111
Telephone: (801) 366-6060
mawood@woodbalmforth.com
sqwood@woodbalmforth.com
*Attorneys for Plaintiff*

Plaintiff's Address:

271 North 400 East
Lindon, Utah 84042